Your Honor, Judith Snyder appearing on behalf of the appellant, Carla Sweet. And I would like to reserve five minutes for rebuttal argument if that proves to be necessary or useful for the Court. We're before the Court on the District Court's grant of the defendant's promotions for summary judgment. That grant of summary judgment was initially based on the findings and recommendations of a magistrate judge that was appealed to an Article III judge and the magistrate judge opinion was upheld by the Court. It might be helpful for me to perhaps preface my comments by telling you what you're not going to have to decide. At the time of the briefing and hearing on the motion for summary judgment, Ms. Sweet's trial counsel conceded that the claim against Mr. Kubiak under the Oregon State law claim was in fact superseded by the Oregon Court Claims Act, and that that claim, the defamation and invasion of privacy claims, were properly only against the school district. Likewise, on appeal, when we looked at the Federal Court claims that had been filed against Mr. Kubiak, we did not proceed on those. We did not believe that they were well taken. So there are no claims against Mr. Kubiak. Does that do away with the defamation, privacy, and false light claim? Only as to Mr. Kubiak, they are still pursued against the school district because the Oregon Court Claims Act is quite clear that you can only bring those claims against the governmental entity. Well, I understand that the only person who was involved was Mr. Kubiak sending out the e-mails. Are you still maintaining that there's some way of connecting it to the school district without tying it in to Mr. Kubiak? Yes, sir. When the complaint was originally filed, those claims were filed against Mr. Kubiak and the school district. Yes. The concession that was made is that under the Oregon law, the Oregon Court Claims Act, acts of a governmental employee occurring within the course and scope of that employee's business are, in fact, attributed to the employer, and the complaint, the claims may only be brought against the employer, only be brought against the school district. I understand that, but if Kubiak was the only one who did anything on behalf of the school district and you concede that he did nothing wrong, I don't see what you have left for the school district. Thank you for suggesting that, because that wasn't my point. My point was not that he did nothing wrong, but rather under the Oregon Court Claims Act, the claims may not be pursued against him. But he was reprobative for what he did wrong. Correct. Correct. And I thought I was going to clarify things. Obviously, I confused the matter. The other concession is that there was a federal law claim under 42 U.S.C. Section 1983 pursued against the school district, but at oral argument, trial counsel conceded that that claim against the school district under 1983 was not appropriate, because there was no action that would impose liability under Manel. But what we are left with are a series of claims against both the Tiger Tualatin School District, two employees of that school district, Ms. Hagen-Gilden and Ms. Johnson, the Northwest Regional Education Service District, and one of its employees, Mr. Barker. Is the claim – are you suing only over the termination, or are you also separately suing about her removal from the school district before – without regard to whether she was ultimately terminated? Correct. We are pursuing both theories. The school district – The damages presumably would be very different. Pardon me? The damages presumably would be very different, but you're interested in both of them. Well, the damages overlap, because once she was removed from the school district, which we assert was as a result of her advocacy on behalf of the disabled students for whom she was responsible, that the service district then offered her positions which she could not accept because of her own disability. But if she would have been terminated in any way as a result of the threats, then the damages for that period would only go up to the point that she would have been terminated. But still, the main thing I want to know is that you are pursuing two theories. Yes, we are. With respect to the claims that have been pursued now against both the school district and the education service district, this is a situation in which there was substantial factual conflict in the evidence. I submit that there is hardly a point on which the parties agreed relative to the submission of evidence, even to the point that there was some dispute as to the dates that certain events occurred and meetings occurred. But as a preliminary matter, knowing that this matter was before the court on the defendant's motions for summary judgment, we are all well aware that all factual disputes must be resolved in favor of the nonmoving party. And yet if you look at the decision of the magistrate judge and the findings and recommendations that were then adopted and approved by the Article III judge, all factual disputes raised by the plaintiff were really swept away. They weren't even commented on or considered relative to the findings that were made. And the facts that were asserted by the school district and the ESD were accepted almost as if they were uncontroverted. And that's where I think the rub is. It would be helpful to go through some of the details. Yes. For example, the district court says that the plaintiff has failed to establish that Hagen-Gilten was aware of any alleged whistleblowing at the time she made the decision to terminate the employment with the school district. So can you point to evidence in the record that counters that? I can't. Or does it matter? I can point to it because there is evidence from the plaintiff's own testimony that at the meeting that was held with Ms. Hagen-Day on September 27 of 2001, approximately 10 days before the meeting involving the student, Ms. Sweet brought to Ms. Hagen-Gilten's attention the fact that she had serious concerns about what was going on at Tigard High School, both with respect to the number of students that were assigned on her caseload and procedural deficiencies. And this is a matter which she had been attempting to discuss with Ms. Hagen for some period of time, but it was only at the September 27 meeting that they had a more detailed discussion about that. At that meeting, Ms. Hagen-Gilten said to her, hey, we've heard a lot of comments that you're abrasive. And Ms. Sweet was saying, I'm not abrasive. What I am is I'm an advocate. I'm advocating for these disabled students. And they had that discussion. That resulted in Ms. Sweet being told, one more complaint about you and you're out. So she went into that meeting of October 9th, where there was going to be this important hearing with respect to the student who was facing expulsion, and she tried to do her job by pointing out the procedural deficiencies and by pointing out the problems with respect to the process that was underway. She was ultimately cut short, and Ms. Johnson, who attended that meeting, reported to Ms. Hagen-Gilten that her behavior at the meeting was inappropriate. Well, the only thing she was doing at that meeting was her job as a school psychologist, maintaining her responsibilities to be sure that the No. Did Hagen-Gilten make the decision after the October 9th meeting? Yes. What did she know about the October 9th meeting? She was not at the meeting. I know. What we know she knew is that Ms. Johnson reported to her that Ms. Sweet's comments and conduct at the meeting were inappropriate. And that there was one other day that Ms. Sweet worked, which was then the 10th, and late in the afternoon of the 10th, she was told by the ESD that Tigard High School did not want her to come back, that she had been asked to be relieved by Ms. Hagen-Gilten, and that the reason was because of her conduct and or comments at the October 9th meeting. I have a question for you on how we address the factual disputes in the record. My understanding is that in a case like this, if there's not direct evidence of discrimination, like someone saying, I don't want her working here because she's disabled or something like that, and if it's a circumstantial evidence case, that we have a Ninth Circuit precedent that requires the circumstantial evidence to be specific and substantial in the Godwin case or something like that. The old burden-shifting issue. So I would like any help from you in terms of what the proper standards are. I mean, we're all aware of that, giving all inferences to the non-moving party. But then when you get this other wrinkle to it that if it's circumstantial, it's got to be specific or substantial. Help me out if you can with how that affects the factual issues here. Judge Gould, I'm not conceding that this is a circumstantial situation. In fact, I believe this presents direct evidence of the district's conduct. You've got to at least cover that, what direct evidence of discrimination there is, and then second, why you think any circumstantial evidence is substantial enough. Certainly. The direct evidence actually starts based upon certain events that occurred in September of 2001, approximately a month before she was told that she was not wanted back at the Tigard-Tualatin School District. At that time, she participated in a meeting that was being conducted by Ms. Hagen-Gilden, and all the school psychologists within the school district attended that meeting. One of the school psychologists did not attend because she was ill. She had pneumonia. That's in the record. And Ms. Sweet walked in with her hand braces on, which she has to wear from time to time because of her rheumatoid and arthritic conditions. Ms. Hagen-Gilden said, oh, great, we have one school psychologist out sick and one wearing braces, thus making a specific negative comment with respect to my client's disabilities. At a subsequent meeting. You have two different theories. One's a disability theory and one's a retaliation theory. It's not very helpful for evidentiary purposes to mix them together because they're entirely different. Oh, is it helpful or is it even possible to pull them apart? Because what Ms. Sweet was doing is she was advocating on behalf of disabled students. So when you look at Ms. Hagen-Gilden's animus towards the disabled, it impacts not only Ms. Sweet as a disabled person, but also the work that she was doing on behalf of those students for whom she was responsible to see that. Let me see if I can help you pull them apart to be specific. Let's turn first to the retaliation claim under the Rehabilitation Act. Yes. If you just skip over with me and go directly to the pretext issue, which covers all of them, as I understand, they contend that there were daily complaints and there was a non-discriminatory issue. And now, as I understand it, you have the burden of showing specific and substantial evidence that these were merely pretext. Where is the specific and substantial evidence that this was a pretext? Twofold. With respect to the allegation of daily complaints, in fact, there is evidence in the record from her coworkers that many of her coworkers found that, in fact, she was very delightful to work with and was appropriate. Is evidence from them or is evidence that she says that? From them, from the deposition testimony. That there's some people that think she's fine doesn't mean it's a pretext. Correct. But as it relates to the issue of the daily complaints, what she was doing was advocacy on behalf of the disabled students under her supervision. That may be, but that doesn't show that it was not a pretext. That is, that they couldn't take these daily complaints as a non-discriminatory reason for what they ended up doing. So where is the clear and specific evidence that that is a pretext? Timing. Are you going to rely on timing? Well, first of all, it doesn't have to be clear and specific. I mean, it doesn't have to be clear evidence. It isn't a clear evidence rule. It just has to be specific enough that somebody could draw an inference. Specific and substantial. Substantial or motivating factor. We have a couple of different standards that we're told there, but I think that that's certainly. As I understand your point, it's that this is a situation where the nature, where what she's saying she was doing could be viewed negatively by people. So they could be complaining about precisely her advocacy. Her advocacy, correct. So, therefore, the fact that there were complaints is not really a neutral reason. It could be the same reason. Correct. And that's why I think this is precisely the type of issue that compels an evidentiary hearing, a trial, so that those factual disputes can be resolved by a trial. It's not like where somebody says, I was making complaints and somebody else says, no, no, the reason I fired you is because you were late. It's not like two entirely separate matters. And then I wasn't being. Do I have your full answer to my question? Timing is the only issue? I don't think it's the only issue, but I do think it is a very significant factor, in that on the 9th, she then participated in this meeting where she was advocating for the problems that the student was facing and the difficulties that the student was having within the school system. And she was pointing out that the people who were participating in that decision-making process did not have the student's IEP in front of them, that there had not been proper procedural protections afforded to the student or due process. She walked out of that meeting and she immediately called her supervisor at the ESD, Ms. LeClaire, and she left Ms. LeClaire a voicemail message saying, you know, we're not going to believe what happened at this meeting. We've got real problems here. And it was within 24 hours of that. I understand the question. I've read it very carefully. Thank you. But if I understand correctly, the daily complaints that they complain about could be a nondiscriminatory reason. But you say that because of this meeting and what occurred thereafter and the timing, that proves by specific and substantial evidence that this is a pretext. That's your argument. Yes, sir. And the rest of it could best be handled by an evidentiary hearing. In the 1983 First Amendment issue, they raised the defense, the Mount Hanifly defense, a good faith belief that plaintiffs made threats. How do you deal with that defense? It seems pretty clear that threats were made. Would the school district in Baker have a Mount Hanifly defense? Well, whether or not they are threats is very much a factual issue. I believe that the court, the magistrate judge, But isn't the question whether they believe they were threats and not whether they were threats? Well, the question is whether they had a factual basis for believing they were threats. Well, it's true they had a factual basis. They were told by her friend who believed them, and they had conflicting views as to whether they were serious or not, and they chose to act on the basis that they were threats. That I have real problems with once you get to the termination, which is why I asked the question at the outset. Well, the only evidence that they had with respect to the statements that were made came from Ms. Helton, the friend. And the statements that were made on the evening of the 16th were not reported to the school district until some hours after Ms. Helton had reported to work and after she'd had the assurances from Dr. Bromstein that, in fact, these were not serious matters. They did, commendably so, talk to her each time directly before they came to a conclusion. They didn't simply take a phone call or something. They actually pinned her down on what exactly was said before they made a decision that this was a serious enough threat that they had to take it into account. They did speak to Ms. Helton, yes. But that particular perception as to what was occurring in that conversation is certainly challenged by other evidence in the record, including the fact that Ms. But that's not the question. That's why I'm coming back. The question isn't whether it was actually a threat. The question is whether they had reason, they believed it was a threat and acted on that belief.  If you're talking about evidence. That's what pretext means. Did they make it up or did they really act for that reason? By the way, you should answer the question while you're engaged, but you've only got a few minutes to rebuttal. I have my eye on the clock. Thank you, Judge Gould. There's two points in time at which the issue of whether they realistically believed it was a threat is significant. The first is with the limited information that they had on the 17th. They may have come to a conclusion that perhaps there's sufficient. I know how they fired her then. They only fired her after a hearing and everything else. Right. But at the time at which they had the hearing, the evidence that was offered was after even there had been an opportunity for a full investigation and for testimony to be offered. And reasonable minds may differ with respect to whether or not they were legitimately justified in finding that was a threat. As an example. Again, that isn't the question. It's not whether they were legitimately justified in finding that it was a threat. The question is whether they actually believed it was a threat. I am not in a position to comment on what they actually believed. We know that certainly the determination that there was a threat justified all the actions taken by the school district and by the educational service district prior to that time. In other words, it was an easy out for them to say, oh, there was a threat, therefore, we do not need to worry about placing this disabled employee in a suitable position. Or, oh, there was a threat, therefore, we do not need to deal with the issue of. But wasn't the timing such that they were, as far as the record shows, and I understand you think it may be subject to a contrary inference as to whether up to the point that the service district learned of the threat, alleged threats, they were trying to place her. They had asked for information from her doctor and so on. And that they only stopped trying to do that once they instituted termination proceedings because of the threat. Well, they became aware of the threat on October 17. The positions that were offered to her continued throughout October. Exactly. It was only after. So about October 25 or so when they got information from the police department and they decided to institute termination proceedings. That was the point in time at which they also got the letter from her doctor with respect to her disability. Can I ask one other question about her disability? I'm having a hard time understanding exactly what her disability is. In what major life activity is she disabled? And what does the record show of it? Don't worry about your time as long as the judge is asking the question. Then you can stop. Just very briefly. Thank you, Judge Gould. As indicated in the record, she's limited in her ability to walk. She's limited in her ability to engage in repetitive manual tasks. She's limited in her ability to drive, which is one of the repetitive manual tasks. She's limited in her ability to stay awake and be wakeful during the day as a result of the various conditions she suffers from. Thank you. Thank you very much. I have no rebuttal. Well, you've used up your time, but we'll see. We might give you one minute. If you want to plan for that, we'll have one minute for rebuttal. May it please the Court. I'm Jennifer Hungerford, and I'm representing the defendants Eger, Tualatin, Schlesinger, Danielle Johnson, and Betraya Hagan-Gilden. And as plaintiff's counsel indicated, Mark Kubiacek is not a defendant on this appeal. Lisa Lear will be representing the remaining defendants, and she'll be speaking for ten minutes at this time. As the Court was recognizing in their questions to plaintiff's counsel, there's simply no specific or substantial evidence of pretext. And in this case, the lower court properly granted summary judgment to defendants in all claims. As to which? As to the removal or as to the termination or both? On both. As to the Tigard-Tualatin school district, they were not involved with her termination. She was not an employee of the school district, and therefore they asked that she be removed from their school district. And why, with regard to removal, isn't there sufficient specific evidence, A, in the fact that she was fired right after this meeting, and that we have lots of cases which, for retaliation purposes, will find timing almost independently dispositive. And here you have timing that's as close as it can get, i.e., the next day. So that seems quite important. And secondly, the fact that, as we were saying before, that the fact that people were acting on complaints or her manner or her inappropriateness and so on, all of those can also, the flip side of them could be exactly what she's saying, advocacy. So why isn't that good enough? The reason why that's not good enough in this case is because of the evidence in the record. And the evidence in the record is based on plaintiff's own deposition testimony, and that's what the court relied on. And I would like to point out some specific examples of that to the court. First of all, plaintiff admitted in her deposition that she never told Petraea Hagen-Gilden, the sole decision-maker here, in terms of removing her from the school district, that anything going on at the school violated the Rehabilitation Act or the IDEA. That's at Plaintiff's Depot 180 and Plaintiff's Depot 56. In addition, plaintiff's counsel painted broad brushstrokes about plaintiff's alleged advocacy in this case. Going back to that last point, did she say in her deposition that she didn't tell anyone at the school district that they were violating the IDEA, or just that she didn't tell this particular decision-maker? In plaintiff's deposition to the places I cited, it's related to that specific decision-maker, Ms. Petraea Hagen-Gilden. In addition to that, if you look at the evidence, if we view the evidence in the light most favorable to the claimant who lost on summary judgment, is there evidence that would permit the reasonable inference that she made the IDEA noncompliant to other teachers or other people? If you look at what plaintiff says in her deposition testimony, and even her affidavit, there's no evidence that she made remarks that would put anyone on notice that the district was violating the law, specifically at the September 27th meeting. Did she say that she told Johnson at the meeting that she should have been looking at the IEP, and after the meeting that there are legal violations here and I'm going to have to report them to somebody? She said that, actually, after the decision was made to have her removed from the district. What she said at the meeting on October 9th. I thought she said that immediately after the meeting she told this to Johnson. No, she did not. That is not in her deposition testimony. Not someplace other than her deposition testimony? I don't recall that from her affidavit. If you look at the handwritten notes attached to her affidavit, and if you look at her deposition testimony, what she says at the October 9th meeting is, we need to go over the IEP, or I had just suggested that she, Danielle, might want to consider the IEP, but did not press the issue. At the meeting? At the meeting. But she also said that right after the meeting she went and told Johnson. I thought so. I'm not right about that. After the meeting, I believe she alleged she spoke with others, but not with Johnson, nor with Ms. Hagen-Gilden. With Woods? Nor with Ms. Woods. That is not in the record. You're wrong. I believe she says she spoke with her office mate, Ms. Stephens, Harold Stephens, and with Mr. Stone. There's no evidence in the record that either of those individuals ever spoke with Ms. Hagen-Gilden prior to Ms. Hagen-Gilden's decision to have her removed from the district. In addition, looking at the complaints the district had about Plaintiff, those go back to Plaintiff's immediate start with the district. And those complaints do not relate to any alleged advocacy. They relate to Plaintiff's communication and interpersonal relationship. If you look at a meeting that Ms. Hagen-Gilden had in September with all the special ed staff, at that meeting the Plaintiff was mumbling to herself to the point it became distracting to others, she was answering questions that were not directed to her, and she was interrupting others when they spoke. It got to the point that Ms. Hagen-Gilden had to specifically ask Plaintiff to stop talking and pay attention so that the meeting could be conducted in a professional manner. Other individuals at that meeting testified that Plaintiff's muttering  At the September 27th meeting, when Ms. Hagen-Gilden brings issues to Plaintiff that they're receiving daily complaints about Plaintiff, Plaintiff's response is to be defensive and to defer blame. And at that time, Ms. Hagen-Gilden was leaning towards having Plaintiff removed from the district because she saw that Plaintiff's communication style was not one that was easy to work with and that she was not interested in solving problems. So therefore, in this particular case, the school district's criticism of Plaintiff's performance do not relate to her advocacy. They are separate from her advocacy. And if you look at the evidence in the record, based on Plaintiff's own deposition testimony, she says she did not have a good working relationship with Ms. Hagen-Gilden. And she also admits she never talked to Ms. Hagen-Gilden about anything that she alleges violated the law. Not necessarily now, but before you were sent down, you raised something you call a standing question. I don't really understand it, and I'd like to hear something about it, but I don't want to interrupt you. The standing question on the re-event. Not necessarily now. I understand that. I just also want to point out that I believe the standing question was raised by the Northwest Regional Education Service District. Actually, the school district went ahead and conceded that she had standing to bring a retaliation claim under the Rehabilitation Act. A couple other points that I wanted to address based on the Plaintiff's reply brief. In this case, Plaintiff asserted in a reply brief that the Mt. Healthy mixed motive analysis does not apply to this case, and based that argument on the Snyder v. Brake construction case from this court. That case is not on point. That was brought under the Labor Management Reporting and Disclosure Act. It was not a Section 1983 free speech case. In Snyder, the court held it was not a mixed motive case because there the defendant's motive was not at issue in that case. Both parties agree as to what motivated defendant's conduct. Rather, the only issue in that case was whether the plaintiff's conduct was lawful or not. In this case, the parties simply did not agree on defendant's motive, but the evidence in the record viewing it in the light and favorable to Plaintiff, a reasonable jury could not find that defendant's motive was unlawful. I'll stop there unless the court has any other questions, and I'll refer to Ms. Lear. Thank you very much. May it please the court, Lisa Lear, appearing on behalf of the Education Service District. I'll just hold that so we don't get tongue-tied here. Mr. Barker, as the court is aware, there are basically four claims involved against the service district here involving the Rehabilitation Act, the First Amendment claim, the Oregon whistleblower claim, and then the disability discrimination claim. I think that all of the claims suffer from one basic problem. There are issues that we've raised with respect to every claim in terms of all of the tests that are applied under each claim and the elements you have to establish. But with respect to each claim, if you assume just for the moment that you get past the early stages of this and have established a prima facie case, you've got a serious problem here with respect to the causation issue, the causal connection or whether you want to call it a nondiscriminatory reason. Whichever test you're applying for any of these claims, it's very clear that what happened in this situation was that the service district received the complaints from the school district that they no longer wanted the plaintiff to be assigned to the school district even more than the problem. That's sort of an interesting problem. Suppose, I mean, there's a report of this meeting with the school district where she says that the reason why they want to get rid of me is because I was advocating. And somebody says to her, well, advocating isn't your job. And they also say, or it's said somewhere in the record, that essentially we don't have that the school district has the right to not take somebody if they don't want to. Correct. Right? Is that the core of your causation argument? Well, no, the core of the causation argument is that what happened, well, there are two parts to it. First, with respect to the transfer, if you want to call it a transfer, out of the Tiger 12th in the school district and when she was basically placed on leave while they looked for another position for her, the education service district didn't have a basis to force the Tiger 12th in the school district to accept any employee. Their contract was to provide that. Right. But I think what's interesting about that is there's a set of cases about customer discrimination, right, where if somebody says, I'm sorry, I won't deal with this white person because she's black, and if the restaurant then says, all right, I'll give you a different white person. Here's a white one. Presumably they're discriminating. Is that right? I think in that circumstance that would be the case. And if you were dealing with a claim here that they had agreed to provide somebody who would not be an advocate for this particular position, we might be in a different situation, but that's not the evidence in this record. What we're dealing with here is a complaint based on her behavior. She also reported to the school district. Well, but that's different. That gets to the merits. But you seem to be saying, I thought, that even if they knew that she was being fired for retaliatory purposes, since they had no choice but to remove her. Was that not your causation argument? That's the causation argument with respect to the transfer, yes, because they can't force anybody to accept an employee. But I'm not going to understand that, and I couldn't tell what the record shows about that, if they then just broke the contract. Presumably the restaurant can say to the individual, you know, leave here. Correct. We won't serve you. Correct. But do we know whether that's what happened or did they send somebody else in? My impression is at first they said they were breaking the contract, but later they said otherwise. Well, they said they were breaking the contract. They do say later that they're not breaking their entire contract with Tigard-Tualatin School District, and they did still have people placed within the school district. For example, the person who made the complaints here was working in the Tigard-Tualatin School District, Indian Elementary School, Ms. Selton. The record does not establish one way or the other. When they sent another psychologist back. Correct. But what they're left with is a situation where they either provide no one or they provide this person, and Tigard-Tualatin School District does not have to accept it. They can't force them to take this person. With respect to the- But if they had sent somebody else in the next day, a non-advocating psychologist, then they'd have a problem. It would certainly be a question. And the answer is we don't know what happened. Correct. We don't know what happened. There's nothing in the record that establishes that. With respect to the ultimate termination of her position with Northwest Regional Education Service District, as the court has been discussing with plaintiff's attorney, that happened after the notice of the threats and the investigation was made. When she was first removed from the school district, she met with Mr. Barker, who offered to find her another position. He initially offered her a Columbia County position, which was the place she had originally applied for a position with the school district. She reported then that she was disabled and would not be able to drive the distance to go to the Columbia County position. Is whether she was disabled an issue in this case? Whether she fits the definition of disability in terms of limiting the significant life activities, as we discussed the issue in our brief, she does have medical conditions. The question is whether she established the information necessary to require the school district to take action, the service district to take action. The problem with her doctor's report is it doesn't meet the standards that talk about substantially limiting major life activities. So we've set out the standards that are discussed in the statute and what has to be done with that. But the other problem is that even if the school district were trying to make accommodations for her to try to find a position that was closer, whatever steps they needed to take, all of that comes to a screeching halt when the school district is notified about the threats and then subsequently receives the report of the investigation, indicating that there was a basis to believe the validity of Ms. Holcomb's reports and creating a very serious issue for the service district in terms of do we continue to send this person out in the role of school psychologist if this person is making these kinds of threats. There was both a preliminary notice to the plaintiff of the decision that was considered. There was an investigation done. There was a preliminary vote by the board. Then there was a full administrative hearing, and the record talks about the five-hour hearing at which both sides presented evidence and provided information about Ms. Helton's understanding of the conversations and what she had heard and the position that she took with respect both to the initial conversations and the subsequent conversations with the plaintiff when the plaintiff tried to get her to sign a statement saying that's not what I said or that I was wrong, I misunderstood, she didn't really make threats, or I misinterpreted it. The entire investigation left the school district or the service district with the conclusion that she had made the threats, that her explanation of the circumstances were not credible in light of the other evidence that they had in the record and some of her statements being inconsistent over a period of time, and they determined that it was in the best interest, obviously, of the service district and the people to whom they would be providing counselors to terminate her position. So, again, we're certainly not conceding all of the elements in each of the claims that you get up to before you ever reach the causation issue or the causal connection issue or, you know, whichever phrase you need to use with the specific text. But for each one of the claims, you've got the circumstance that if you could get to the point of asking whether or not the decision to terminate her was substantially related or caused by her expressive conduct. It's very clear here that what the service district did is perform an investigation, come to a conclusion based on the evidence that she had engaged in this misconduct, and that it was serious enough to justify her termination. That's with regard to the termination. I'm sorry? That's with regard to the termination. Correct. With regard to her removal, we have this sort of hole in the record. So to whose disadvantage is the hole in the record in New York as to whether or not they simply said, all right, we're not sending any psychologists to the school district anymore or otherwise? Well, certainly that question is not answered by the record, but I don't think that itself creates an issue of fact. Why not? What we have here is a situation where the service district said, we transferred her based on the request of the Tigard-Tualatin School District based on their desire to no longer have her placed there. But they knew about the advocacy. They knew that she was claiming that it was really because of her advocacy. She reported that to Mr. Garper, yes. And they did tell her that that's not the position she was hiring. So basically they said, essentially, even if that were true, we are simply going to remove you anyway. Because, essentially, our policy is if the school district says they don't want you, they don't have to have you. Well, I'm not sure they put it that way. What they said is that we can't force the school district to take you. At one point, Mr. Garper did offer to perform an investigation if that's what she wanted, but he made it very clear to her that their decision to transfer her out of that school district was not disciplinary and that there would be nothing placed in her file or her record dealing with – Because the school system has said we don't want any African-American school psychologists. If the school district had done that sort of thing, obviously the Northwest Regional Education Service District couldn't provide – couldn't deal with them. But that – why isn't this a structurally similar question? I mean, I understand that there are issues about whether that was really the reason, but you're saying it was a causation problem, and that's where I'm having an issue. Again, the causation problem here is that the service district is not the actual employer in terms of – I know, but I just gave you a hypothetical, and you agree that if in fact they said we don't want any African-Americans psychologists to take her back, that they could be responsible for the discrimination. They could be responsible for discrimination, yes. But in this situation, there is nothing to establish the extra step that you have there that they continue to work with the Tigard High School in terms of providing a psychologist to that school. So we know in general they continue to work with Tigard High School, but they didn't break their contract. They continue to work with the school district in the sense that other – Well, that was the customer, basically, was the school district. Was the school district, and in this particular situation, it was a position at Tigard High School. I mean, it's an interesting question, and I'm not sure you've really dealt with it. Well, I'm not sure I can give you much more than I have, because there's nothing in the record to support it one way or the other, but – No, but there is something in the record to say that they did not break off the relationship with the school, with the customer. They didn't say, customer, you know, we're just not going to deal with you. They had other people still placed in the district. Correct, that's correct. And they did not break off that part of the relationship, no. I understand you think that the predicate is flimsy, i.e., whether or not she was really fired for that reason, but I'm assuming that for this purpose. And again, even assuming that, you still have the problem with whether the school district could continue to provide other types of services, not dealing with this particular circumstance, assuming that the people at the high school had said, we are not going to accept anybody who's going to advocate on behalf of disabled students any further. I don't think that when the school district comes in and says, here's our evidence, there are no issues of fact, and they don't come back and say, yes, there's an issue of fact, in the sense that there is a basis upon which, in this record, you can establish liability based on discrimination. There's nothing in the record to support that. They haven't created an issue of fact. The fact that there might be something out there that's left unanswered doesn't create an issue of fact. Ms. Leary, your time is up, but we're going to give your colleague, Ms. Sweet, an extra minute. So you can take another minute if you want. I just wanted to quickly address the question that you asked about the standing issue on the ADA. I actually don't understand the issue you're raising. Let me tell you why I don't understand it. As I understand it, the RHA itself doesn't have retaliation provision, but it incorporates the retaliation provision from the ADA, and the ADA has a retaliation provision that speaks in terms of any individual, not in terms of disabled people. So what's the problem? The problem comes into the language that was in the statute originally. In 1978, it was amended to incorporate. Actually, it incorporates the provisions of Title VI, which does include retaliation. I thought it also incorporates the ADA, substantively. Yes, but the retaliation provision comes through Title VI. Why does it come through Title VI? It seems to me that it came through the ADA. I may be mistaken. Okay. The problem that arose here is the situation this Court has addressed in other circumstances, the question whether a statute that does not provide a specific remedial basis for relief beyond the people to whom the statute is directed. But that's what I'm saying. It does. It says any individual. And obviously it has to. We have retaliation provision. It deals with witnesses and complainants and so on. The statute is written in those terms. I do agree that there is now case law that would indicate that the retaliation provision is intended to be broad enough to incorporate the plaintiff in this situation. What case law is that? The Weber case, the first record case. I didn't understand that opinion either for the same reason. It was talking about an abstract Article III or prudential standing issue. But the problem that's come up in this series of case law, and we were tracking an argument that's been made in other situations where the Court said if you've got a statute that provides a specific remedy directed to a certain type of individual in this case, a disabled individual, that that's the source of the problem. We're two minutes over. We're going to have to close it. The panel wants supplemental briefing. We'll order it. But we will permit your rebuttal now. If you keep it fair, you can have two minutes, but not a second more. Thank you, Judge Gold. You've been very fair. Actually, I'd like to respond to your question, Judge Berzlin, with respect to what evidence there is in the record with respect to Ms. Sweet's complaints about what was going on at the October 9th meeting. If you look at the declaration that was filed by Ms. Sweet in opposition to the defendant's motions for summary judgment, it's in the record as our first exhibit. And specifically, if you look at page 12, her comments with respect to that meeting are that she was not asked to sign the manifesto of determination. Ms. Johnson did not offer the document to her for signing. She says, I told Ms. Johnson that I would need to file a complaint about the meeting because the process that was followed violated the student's due process rights. Was that declaration, it was a declaration she introduced without her lawyer, right? No, this is actually the one that her lawyer was involved in. And it was introduced in the record. Yes, it was. And that is the first exhibit in the excerpt of the record. And having said that it was the one that her attorney prepared, I want to clarify, yes, it must be. It has Mr. Gould's letterhead on it. The other issue is with respect to the credibility of that comment that is corroborated by the fact that she immediately called her supervisor at the ESD, Ms. LeClaire, and reported what had happened at the meeting. It's further corroborated by the fact it was Ms. Johnson, the person to whom she made the complaint about what was going on at that meeting, the person who participated in the meeting. Ms. Johnson is the one who went to Hagen-Gilden and said, hey, we've got to get rid of her. And when Hagen-Gilden spoke with the ESD, she told them it was because of Ms. Sweet's comments and conduct at the October 9th meeting. And that information was disclosed to Ms. Sweet at the October 16th meeting with the ESD, where Mr. Barker and more of the assistant superintendent of the ESD said, yeah, we got a call and said it was because of your behavior at the October 9th meeting. All right. They said it was because of the connoisseurs, not because of what she said. Okay. Well, thank you very much. Thank you. Very nicely argued by both sides. We will take a recess for 10 to 15 minutes. Maybe everybody could be back here in 10 minutes. We might need to wait another five. All right. Thank you. Thank you. Thank you.
judges: Wallace, Gould, Berzon